THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v EARL ALLEN, Appellant.

First Department, June 4, 1985

**APPEARANCES OF COUNSEL**

*David Samel* of counsel (*William E. Hellerstein,* attorney), for appellant.

*Roger L. Stavis* of counsel (*Peter D. Coddington* with him on the brief; *Mario Merola, District Attorney,* attorney), for respondent.

**OPINION OF THE COURT**

FEIN, J.

At the *Mapp* hearing, Detective Taranto testified that on February 19, 1983 he was working the 4:00 P.M. to 1:00 A.M. tour of duty. During that time he accompanied 6 or 7 members of the Teaneck, New Jersey, Police Department to 1368 Webster Avenue in The Bronx, to execute a fugitive warrant. The New

Jersey police sought one Timothy Frazier who was believed to live in apartment 12F in that building. Taranto had no description of Frazier, and was informed only that Frazier was wanted in connection with a burglary. Taranto had no knowledge of any claim that Frazier had been armed during the alleged burglary.

All of the officers, including Taranto, were dressed in plain clothes. Upon arriving at the building, they took the elevator to the 12th floor. When the elevator door opened, Taranto saw defendant Earl Allen standing in the hallway, facing the elevator. Taranto did not know whether Allen was the fugitive Frazier. None of the New Jersey officers indicated that he was.

At the *Mapp* hearing, Taranto testified that the defendant looked into the elevator, "took a half a step back and put his hand to his right side pocket. Seeing that I jumped out of the elevator and grabbed his hand. As I grabbed his hand I felt a gun in his pocket; turned him around, took the gun out of his pocket and placed him under arrest." In his testimony before the Grand Jury, the officer testified, "As the door opened he placed his hand by his right hand coat pocket with this [*sic*]. I was the first one out of the elevator. I grabbed his hand and as I grabbed his hand there was a gun in his pocket." In the investigating District Attorney's report there was no mention that the officer stated that the defendant stepped back. A pouch containing two rounds of ammunition was recovered during a subsequent search of the defendant.

At least one other person was in the 12th floor hallway when the officers emerged from the elevator. One of the other officers searched him. However, he was not arrested.

In our view, when the officer grabbed defendant's hand and removed the gun, this constituted a seizure, an unreasonable intrusion. There was neither reasonable suspicion warranting a frisk, nor probable cause justifying a search and seizure. "Simply stated the proper analysis in cases of this nature is to examine the predicate for the police action and then determine whether or not that predicate justified the extent of the official intrusion on the individual." (*People v Stewart,* 41 NY2d 65, 66.) *People v Benjamin* (51 NY2d 267), relied on by the suppression Justice, is plainly distinguishable. In that case two plain-clothes police officers received a radio run to the effect that men with guns were at a designated location. Upon arriving at the scene, the officers observed approximately 30 people. As the officers walked through the group and while they were approximately 10 feet from Benjamin, he stepped backward toward the curb and reached underneath his jacket to the rear of his trouser

waistband. A limited pat down of Benjamin yielded a loaded gun. The information in the possession of the officers that men with guns were present and their observation of the defendant's behavior gave rise to a reasonable suspicion that he might be armed, warranting the limited intrusion which produced the loaded revolver.

Here, there was no such basis for grabbing defendant's hand. There was no indication that he was the fugitive, and no basis for a suspicion that he was armed. The suggestion that because this was a high crime area the police conduct was justified has no basis. It may well be that the defendant's reaction was premised upon seeing 7 or 8 men dressed in plain clothes simultaneously emerging from an elevator which caused him to step back, if indeed he did step back. If there was fear, it may well have been fear on his part.

It is notable that he was not the fugitive, nor was the other person who was on the floor and who was likewise searched. The fact that the police officers were executing a fugitive warrant provided no justification for searching everyone in their path, including defendant. Although the suppression Justice accepted the officer's *Mapp* hearing testimony that the defendant stepped back upon observing the officers, it is to be noted that Taranto gave no such testimony before the Grand Jury and did not so advise the investigating District Attorney.

The problem we face is not uncommon. We are examining the behavior of an individual waiting to enter an elevator in an apartment house who observes 7 or 8 persons attempting to leave the elevator at the same time. What is he to do? Stand still, move or what? The issue is exacerbated when it is realized that the incident here involved took place at 12:30 A.M. What could be more normal, customary and proper than for the individual to step back to make way and perhaps to reach for his pocket for whatever purpose?

The dissent tells us that because an experienced police officer concluded that such a normal reaction indicated that the defendant was armed, it was lawful for the officer to grab defendant's arm, plainly a seizure. If this be so, it should teach all of us to stand stock still and make no movement when we, waiting for an elevator, are confronted with a similar situation. It may well be that standing stock still is an unusual response, which an experienced police officer may regard as suspicious.

We deal here not only with the rights of this defendant, but all of our rights.

As stated in *Terry v Ohio*, the seminal case on the subject (392 US 1, 12-13): "For the issue is not the abstract propriety of the police conduct, but the admissibility against petitioner of the evidence uncovered by the search and seizure. Ever since its inception, the rule excluding evidence seized in violation of the Fourth Amendment has been recognized as a principal mode of discouraging lawless police conduct. See *Weeks* v. *United States,* 232 U.S. 383, 391-393 (1914). Thus its major thrust is a deterrent one, see *Linkletter* v. *Walker,* 381 U.S. 618, 629-635 (1965), and experience has taught that it is the only effective deterrent to police misconduct in the criminal context, and that without it the constitutional guarantee against unreasonable searches and seizures would be a mere 'form of words.' *Mapp* v. *Ohio,* 367 U.S. 643, 655 (1961). The rule also serves another vital function — 'the imperative of judicial integrity.' *Elkins* v. *United States,* 364 U.S. 206, 222 (1960)."

As further stated in *Terry* (at p 16): "Our first task is to establish at what point in this encounter the Fourth Amendment becomes relevant. That is, we must decide whether and when Officer McFadden 'seized' Terry and whether and when he conducted a 'search.' There is some suggestion in the use of such terms as 'stop' and 'frisk' that such police conduct is outside the purview of the Fourth Amendment because neither action rises to the level of a 'search' or 'seizure' within the meaning of the Constitution. We emphatically reject this notion. It is quite plain that the Fourth Amendment governs 'seizures' of the person which do not eventuate in a trip to the station house and prosecution for crime — 'arrests' in traditional terminology. It must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person. And it is nothing less than sheer torture of the English language to suggest that a careful exploration of the outer surfaces of a person's clothing all over his or her body in an attempt to find weapons is not a 'search.' Moreover, it is simply fantastic to urge that such a procedure performed in public by a policeman while the citizen stands helpless, perhaps facing a wall with his hands raised, is a 'petty indignity.' It is a serious intrusion upon the sanctity of the person, which may inflict great indignity and arouse strong resentment, and it is not to be undertaken lightly."

The *Terry* court further concluded that when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen, a seizure has occurred. We are required to evaluate the reasonableness of each search or seizure in the light of the particular circumstance. In other words,

"it is imperative that the facts be judged against an objective standard". (*Terry v Ohio, supra,* at p 21.)

The dissent suggests that we are concerned with the experience of the officer and his good faith. The standard laid down in *Terry* (*supra,* at pp 21-22) is otherwise. The question posed is whether "the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate? (Cf. *Carroll* v. *United States,* 267 U.S. 132 [1925]; *Beck* v. *Ohio,* 379 U.S. 89, 96-97 [1964])."

Speaking to the issue of good faith relied on in the dissent, *Terry* states (*supra,* at p 22): "Anything less would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches, a result this Court has consistently refused to sanction. See, *e.g., Beck* v. *Ohio, supra; Rios* v. *United States,* 364 U.S. 253 (1960); *Henry* v. *United States,* 361 U.S. 98 (1959). And simple ' "good faith on the part of the arresting officer is not enough." ... If subjective good faith alone were the test, the protections of the Fourth Amendment would evaporate, and the people would be "secure in their persons, houses, papers, and effects," only in the discretion of the police.' *Beck* v. *Ohio, supra,* at 98."

The dissent also suggests that we overlook the danger faced by the police. In *Sibron v New York* (392 US 40, 64) the court stated: "The police officer is not entitled to seize and search every person whom he sees on the street or of whom he makes inquiries. Before he places a hand on the person of a citizen in search of anything, he must have constitutionally adequate, reasonable grounds for doing so. In the case of the self-protective search for weapons, he must be able to point to particular facts from which he reasonably inferred that the individual was armed and dangerous. *Terry* v. *Ohio, supra.*"

It is notable that in *Sibron* (*supra*) the United States Supreme Court concluded as a fact that *Sibron* was reaching in his pocket for narcotics and that the police officer so concluded. However, the *Sibron* court, in directing that suppression was required, noted that the New York courts in denying suppression, had concluded that there was a possibility that the defendant might be reaching for a gun.

As concerned as we must be for the safety of every officer, we need to be equally concerned with the right of privacy and the personal security of the individual. Although it is not always easy to reconcile the two, the test is not merely society's interest in stopping crime and the danger to the policeman, but the

rights of the individual involved and the interests of the 4th Amendment in vindicating the rights of all of us.

The rule is well expressed in *People v Cantor* (36 NY2d 106), where the circumstances are more nearly akin to this case. The defendant had been under observation for some time by a number of policemen who apparently believed that he was engaged in some kind of narcotics activity. The defendant and his female companion were smoking cigarettes, which the police thought to be marihuana, at approximately 2:30 A.M. in a Brooklyn apartment. They emerged from the building and entered defendant's automobile and drove away. The plain-clothes police followed in an unmarked vehicle all the way to Queens, where the defendant was observed to park his car in front of a house which they later discovered was his residence. At this point, at approximately 3:00 A.M., the officers decided to stop the defendant and ascertain his identity. When defendant pulled to the curb, the unmarked car halted some distance behind defendant's car and two officers exited. The remaining officer then drove the unmarked car past defendant's car, blocking it from moving forward. The officers then moved toward defendant who had alighted from his own car. The defendant testified that he was holding his dog and had his keys in his hand when he saw three men in street clothes approaching from different directions. One of the officers testified that, before the police identified themselves, Cantor reached into his back pocket and removed what the officer believed to be a silver pistol, which he pointed at the police. One officer then took his badge from his pocket, drew his revolver, identified himself as a policeman and told Cantor to freeze and place his hands over his head. The defendant complied with the order after returning the pistol to his pocket. The officers then approached and removed the pistol. Cantor was then arrested. Although Cantor testified that he never drew the pistol, the suppression Judge found to the contrary.

In suppressing the pistol, the Court of Appeals stated (36 NY2d 111-113):

"Whenever an individual is physically or constructively detained by virtue of a significant interruption of his liberty of movement as a result of police action, that individual has been seized within the meaning of the Fourth Amendment (*Terry* v. *Ohio, supra*). This is true whether a person submits to the authority of the badge or whether he succumbs to force. Here the defendant was deprived of his freedom of movement when he was encircled by three police officers as he stood alongside his

car which was blocked by the police vehicle. At that moment he could not have proceeded on his way, therefore he was seized. (See, e.g., *United States* v. *Nicholas,* 448 F. 2d 622; *United States* v. *Strickler,* 490 F. 2d 378.) \* \* \*

"While the police should be accorded great latitude in dealing with those situations with which they are confronted it should not be at the expense of our most cherished and fundamental rights. To tolerate an abuse of the power to seize or arrest would be to abandon the law-abiding citizen to the police officer's whim or caprice — and this we must not do. Whenever a street encounter amounts to a seizure it must pass constitutional muster \* \* \*

"To justify such an intrusion, the police officer must indicate specific and articulable facts which, along with any logical deductions, reasonably prompted that intrusion. Vague or un-particularized hunches will not suffice (*Terry* v. *Ohio,* 392 U. S. 1, *supra; Wong Sun* v. *United States,* 371 U. S. 471, 479). Nor will good faith on the part of the police be enough to validate an illegal interference with an individual (e.g., *Terry* v. *Ohio, supra; Henry* v. *United States,* 361 U. S. 98, *supra; Hill* v. *California,* 401 U. S. 797; *Smith* v. *County of Nassau,* 34 N Y 2d 18).

"Before a person may be stopped in a public place a police officer must have reasonable suspicion that such person is committing, has committed, or is about to commit a crime (CPL 140.50). Reasonable suspicion is the quantum of knowledge sufficient to induce an ordinarily prudent and cautious man under the circumstances to believe criminal activity is at hand."

*People v Carrasquillo* (54 NY2d 248) is equally instructive. In that case, where suppression was granted, the court stated (54 NY2d, at p 252): "Nor, for the purpose of determining whether any detention could be so premised, can it be said that the turn he took at the corner, towards which he already was heading when the police drove up, provided an excuse to invade his personal security; given that almost any change in direction will call for sudden alteration in body movement, no more significance can be attached to the officer's instantaneously perceived impression that defendant's turn was 'quick', especially when at all other observed times he was seen to walk at a 'normal' pace. These, neither singly nor in combination, constituted other than 'innocuous behavior', sole reliance on which would impermissibly reduce the foundation for any intrusion to nothing but 'whim or caprice' (*People v De Bour,* 40 NY2d 210, 216-217; see, also, *People v Howard,* 50 NY2d 583, 590; *People v Allende,* 39

NY2d 474, 477). By no means do they reach the level of 'reasonable suspicion', which this court in *De Bour* indicated was essential to justify an encounter 'involving actual or constructive restraint' (*People v De Bour,* 40 NY2d 210, 216, *supra*)."

Thus, the fact that in our case the defendant stepped back in the face of the officers, and simultaneously moved his hand toward his pocket, was innocuous and did not reach the level of that kind of equivocal behavior which might justify the police action. There was no inquiry whatever and no bulge or weighted jacket or coat was observed. All that was observed was merely a normal reaction. The applicable principles are well set forth in *People v De Bour* (40 NY2d 210) where the court said (at p 216): "We have frequently rejected the notion that behavior which is susceptible of innocent as well as culpable interpretation, will constitute probable cause (*People v Davis,* 36 NY2d 280; *People v Oden,* 36 NY2d 382; *People v Russell,* 34 NY2d 261; *People v Corrado,* 22 NY2d 308). It is equally true that innocuous behavior alone will not generate a founded or reasonable suspicion that a crime is at hand. (Compare *People v Martinez,* 37 NY2d 662, and *People v Allende,* 39 NY2d 474, with *People v Singleteary,* 35 NY2d 528, and *People v Green,* 35 NY2d 193.) Here, we agree with the appellant that this encounter was supported by less than reasonable suspicion and consequently would not justify a stop involving actual or constructive restraint."

It is plain that the activity of the police in our case violated that standard. The behavior of defendant was innocuous. As these and other cases demonstrate, neither the experience of the officer nor his good faith are the test. It is, rather, the reasonableness of his activity in the light of all of the circumstances. On the facts of record in this case, nothing justified the seizure. To hold otherwise would be to conclude that whenever a person seeking to enter an elevator steps back to allow the passengers to emerge, and the person simultaneously reaches for his pocket, he is subject to seizure. The 4th Amendment permits no such violation.

To justify a stop and seizure, there must first be a founded suspicion that criminal activity is present and that the person stopped was or is involved in such activity (*People v Cantor,* 36 NY2d 106, 111-112, *supra; see, People v McGriff,* 99 AD2d 818).

*People v Fripp* (85 AD2d 547, *affd* 58 NY2d 907) is instructive. There, officers executing a search warrant were found to have improperly searched defendant in the second-floor hallway of the building without making any effort to ascertain if he was going to the subject apartment or to another apartment on the

same floor, albeit he was carrying a small, closed, zippered purse in which a nine millimeter gun was found. As this court noted (p 547), such a purse "could be utilized for many forms of noncriminal behavior", and "no telltale signs, such as a bulge or an outline of a gun, were observed." Although there was some testimony that " 'defendant moved his right hand to the bag * * * and turned back towards the stairwell door' " (p 547), this was insufficient for a seizure. The conduct of the defendant was found to be capable of more than one interpretation, including an interpretation consistent with innocence. As here, those agents made no inquiry whatever before forcibly seizing and searching the defendant. It is notable that in that case, as in ours, approximately eight officers were on the floor at the time the defendant entered. The conduct of the defendant there, as here, was capable of more than one interpretation, at least one of which is consistent with innocence. The agents erred there, as did Taranto here.

If Taranto's frisk can be upheld, it can only be on the predicate that defendant stepped back and placed his hand to his pocket. Stepping back to allow 7 or 8 men dressed in civilian clothes to emerge from an elevator can hardly be deemed to be suspicious. Reaching toward one's pocket, even where there is a heavy but undefined bulge, does not create a reasonable suspicion that the individual is armed (*People v Bernard,* 41 NY2d 759, 762-763; *People v Roberts,* 94 AD2d 237, 241). As those cases hold, where there is no objectively suspicious activity, there is no justification for seizure or a pat down. Even if Taranto truly feared for his safety, that fear was not founded upon reason. See, *People v Russ* (61 NY2d 693, 695), noting "No inquiry was made of defendant so she neither refused to answer nor answered evasively (see *People v Klass,* 55 NY2d 821); no suspicious bulge was perceived in her clothing (cf. *People v De Bour,* 40 NY2d 210, 213); no furtive movements were made by her (see *People v Benjamin,* 51 NY2d 267, *supra*)".

While defendant made some movements, they can hardly be characterized as "furtive" (*People v Bernard, supra; People v Roberts, supra*). The only indication of criminality here is defendant's geographic proximity to a fugitive, albeit in a "high crime neighborhood". This does not justify a prophylactic search or frisk of every person the police encounter, or even those who reach for their pockets. Wholesale frisks of persons who are in the vicinity of a wanted fugitive are without sanction. There was no reasonable suspicion of criminal activity to justify the search.

The dissent states, "Given the reality that the defendant almost certainly appreciated that the 7 or 8 persons in the

elevator were police officers, his sudden movement to his pocket seems to me clearly sufficient to have given rise to a reasonable suspicion on the part of Detective Taranto that the defendant was armed and reaching for his weapon." There is simply no evidence in the record that defendant knew the 7 or 8 persons in the elevator were police officers. With all due respect, it is incredible that defendant would have reached for his gun had he known or suspected he was facing 7 or 8 police officers. On this record the reality is plainly otherwise. Defendant was faced with 6 or 7 men in civilian clothes emerging from an apartment house elevator at 12:30 A.M. If he did indeed step back what would be more natural. I suspect that each of us might well do the same.

As observed in *People v Cantor* (36 NY2d, at p 112): "We place no significance on the fact that the defendant did not know he was being accosted by the police thinking instead that he was about to be robbed. The crucial factor was that depriving the defendant of his freedom of movement was effected by the police. Constitutional protections do not vanish merely because the victim of the unlawful governmental action fails to perceive the identity of the violator as a police officer".

The dissent relies on a complete acceptance of the detective's version of the events at the *Mapp* hearing, which as we have noted differs substantially from his testimony before the Grand Jury and the version he apparently gave to the investigating District Attorney.

In essence what occurred was that in the face of normal, innocuous behavior the officer's response was premised upon a "hunch" or "gut reaction". Such a reaction is insufficient on which to found a stop and seizure (*People v Sobotker,* 43 NY2d 559, 564).

The judgment, Supreme Court, Bronx County (Harold Silverman, J.), rendered November 10, 1983 convicting defendant upon a plea of guilty of criminal possession of a weapon in the third degree, and sentencing him as a second felony offender to an indeterminate term of 2 to 4 years should be reversed, on the law and the facts, the motion to suppress granted and the indictment dismissed.

SANDLER, J. (dissenting). On February 19, 1983, at approximately 12:30 A.M., Detective Taranto, accompanied by approximately six other officers from the New York City and Teaneck, New Jersey, Police Departments, proceeded to an apartment building at 1368 Webster Avenue, Bronx, to arrest one Timothy Frazier under a New Jersey fugitive warrant for burglary. Detective Taranto had received information that Frazier lived

in apartment 12F. He and the other officers were dressed in plain clothes.

The officers took the elevator to the 12th floor. As the elevator opened on the 12th floor, Detective Taranto saw the appellant some 3 to 5 feet away. Detective Taranto testified: "As I saw him, he looked at me and took a half a step back and put his hand to his right side pocket. Seeing that I jumped out of the elevator and grabbed his hand. As I grabbed his hand I felt a gun in his pocket; turned him around, took the gun out of his pocket and placed him under arrest." Thereafter, Detective Taranto recovered from appellant's jacket pocket a brown pouch containing two live rounds.

Further on in the hearing the Assistant District Attorney asked the detective to demonstrate to the hearing court the movements of the defendant. The record discloses the following:

"A. When the elevator door opened the male in front of me went this way. As he backed up, took a half a step back and put his hand on his right side.

"MR. STAVIS: For the record I will say that the officer is backing up and putting his hand towards his right pocket.

"Q. What were your thoughts when you reached for defendant's arm? A. I thought maybe he had something, a gun or knife or something. He reached his arm as if he had something in his pocket. Not knowing what it was, I just grabbed his hand.

"Q. And when you grabbed his hand did you feel anything? A. Yes, I did.

"Q. What was that? A. I felt an outline of a gun."

The majority of this court has concluded that the above events did not give rise to a reasonable suspicion that defendant was armed sufficient to justify the detective's action. I do not agree.

Let me acknowledge that in the usual situation there is nothing suspicious in a person at an elevator door stepping back to permit the occupants of an elevator to exit, or in someone placing his hand by his side in the area of his pocket. It seems to me equally indisputable that a person may move his hand toward his pocket under such circumstances and in such a manner as to convey to an experienced police officer a substantial possibility that the person is armed and is reaching for a weapon. Whatever else may be in doubt here, it cannot be seriously questioned that this officer acted in a good-faith belief that the defendant's actions disclosed such a possibility.

The real problem in this case arises from the circumstance that the characteristics which distinguish the innocuous behav-

ior described in the court's opinion from the threatening behavior as interpreted by the detective are not easy for the average witness to describe. These characteristics include such matters as the expression on a person's face, the sense of anxiety and tension that he manifests, and the speed, direction and inherent character of the arm's motion in the direction of the pocket. Phenomena of this kind are not easy for a witness to describe even where the interrogating District Attorney is sensitive to the problem presented for an appellate court in determining the reality of what occurred from the record without the benefit of the demonstration that was here given to the hearing court. Notwithstanding the absence of some significant details in the testimony of the officer, I think the record discloses three circumstances which, taken together and sensibly evaluated, amply justify the hearing court's determination.

First, as already observed, it is obvious that this officer acted in the good-faith belief that there was a real possibility that the defendant was armed and was reaching for a weapon. This is not the more frequently encountered situation in which officers act in part on previously received information, or on the basis of observations made from a vantage point of safety which provide an opportunity for reflection before police action. What occurred here was plainly a spontaneous reaction by a veteran police officer to what he perceived as a potentially dangerous motion by the defendant. The validity of this kind of response by an officer with many years of experience with street encounters does not seem to me something that should be lightly disregarded.

Second, the hearing court had the benefit of observing a demonstration by the officer of the actual movement by the defendant that led to his action. The accompanying description of the demonstration by the Assistant District Attorney was regrettably unilluminating, but it can hardly be doubted that the hearing court had a better understanding of what the officer was trying to communicate than is available to us from the printed record. No doubt the weight to be attached to that circumstance is something as to which reasonable people may disagree. I think it is entitled to some consideration.

Finally, the officer testified explicitly: "He reached his arm as if he had something in his pocket." Although conclusory in form, given the inherent difficulty in describing the kind of behavior involved, this testimony seems to me an adequate basis for the conclusion that the defendant was in fact reaching for something in his pocket. Given the reality that the defendant almost

certainly appreciated that the 7 or 8 persons in the elevator were police officers, his sudden movement to his pocket seems to me clearly sufficient to have given rise to a reasonable suspicion on the part of Detective Taranto that the defendant was armed and reaching for his weapon.

A difficulty in cases presenting the kind of issue raised here is that the results frequently turn on individual factors in such a way that it is often impossible to say that any particular precedent is clearly controlling. I agree with the majority opinion that the factual pattern here differs from that presented in *People v Benjamin* (51 NY2d 267) relied upon by the hearing court. Nonetheless, the essence of the issue developed by the factual circumstances in *Benjamin* seems to me basically the same as that presented here. I also agree that the issue presented here is very close to that addressed by this court in *People v Fripp* (85 AD2d 547, *affd* 58 NY2d 907) in which a closely divided court reversed and granted the motion to suppress. But I would observe as to *Fripp* that the Court of Appeals affirmance was limited to the narrow ground that the findings involved mixed questions of law and fact which were beyond the power of that court to set aside because supported by substantial evidence, and I would also invite attention to Judge Fuchsberg's notable dissenting opinion in that case.

Several other aspects of the court's opinion merit comment. I find no basis whatever in the record for the notion that Detective Taranto acted on the basis of the view that he had a right to undertake a "prophylactic search or frisk of every person" encountered by the police on their way to execute the arrest warrant. Nor was any suggestion of such a claim advanced in the District Attorney's appellate argument.

As to the comment in the majority opinion that there is no evidence that defendant knew any persons on the elevator were police officers, I agree that in one sense this statement is accurate. There is no direct evidence of such knowledge. When the circumstances are viewed from the perspective of human experience, I suggest there is a very substantial basis for the conclusion expressed in this opinion. Is it really likely that when the defendant observed some 7 or 8 men, at 12:30 A.M., emerging from an elevator onto the 12th floor of a building in a high crime area, that he did not immediately sense from their appearance and manner that these were police officers? And if defendant reached for his weapon because he perceived the officers as civilians who might have posed a threat to him, would that have made the situation any less dangerous to those officers' safety?

As to the further comment that it would have been incredible for him to have moved for his gun if he believed them to be police officers, I would suggest that an instinctive movement by an unlawfully armed man for his gun upon the sudden appearance of police officers, however imprudent this action might appear after a period of reflection, is not at all difficult to believe.

I also find unpersuasive the suggestion in the majority opinion that the presence in the elevator of 7 or 8 officers somehow excluded any realistic possibility of danger to them if the defendant were armed and if he were reaching for his weapon. If the defendant had in fact produced a gun from his pocket, each of the officers in that elevator would have been in immediate danger. Even if one or more of the officers in the elevator had reached for their guns in response to the defendant's motion, and the result had been an armed confrontation between the officers and the defendant, I do not see that as a situation that may reasonably be viewed with a sense of equanimity.

It should be made clear that the issue that divides the court is not one of law, the applicable legal principles here being simple and free from doubt, but rather arises from a fundamental disagreement as to the nature of the factual situation disclosed by the evidence. Let me restate clearly my understanding of what occurred.

Detective Taranto and his brother officers were assigned to a mission involving some element of danger, the degree of which could not be determined in advance. All might go well and without incident, as I assume usually occurs when fugitive warrants are executed. On the other hand, notwithstanding the fact that the charge underlying the warrant was one of burglary, the possibility could not be excluded that the officers would be confronted by a desperate man, determined to use every possible means to resist his apprehension. Caution was clearly required, undoubtedly the reason that so many officers were assigned.

When the elevator door opened on the 12th floor, after midnight, disclosing the defendant, and he suddenly moved his arm toward his pocket, reaching "as if he had something in his pocket", it seems to me inevitable that Detective Taranto reacted on the basis of the possibility that the defendant was armed and was going for his weapon. I do not believe that any other experienced police officer would have reacted differently. Given the time, place and circumstances, it was manifestly reasonable for the detective to resolve any substantial doubt in favor of protecting himself and his brother officers.

I remain unable to understand the basis on which a majority of this court has concluded that there was not a reasonable basis

for the sense of fear that Detective Taranto clearly experienced. That judgment appears to rest primarily upon a factual determination that the defendant's arm movement was of a normal nonthreatening character, a view contradicted explicitly by the detective's testimony that "he reached his arm as if he had something in his pocket", and contradicted implicitly by the spontaneous nature of the officer's reaction to what he, and not we, observed.

The court's opinion clearly reflects a sensitive, appropriate concern for the indignity, indeed outrage, experienced by law-abiding individuals who are subjected to an offensive touching of their persons. I fully share this concern. But, with the utmost respect for the court majority, neither the decision in this case, nor a thousand like it, will reduce by one the occasions on which officers frisk individuals when the frisk is evoked by a sense of fear for the personal safety of the officers produced by an apparently threatening movement in a potentially dangerous situation.

Accordingly, the judgment of the Supreme Court, Bronx County (Harold Silverman, J.), rendered November 10, 1983, which convicted the defendant of criminal possession of a weapon in the third degree and sentenced him to an indeterminate term of 2 to 4 years in prison, should be affirmed.

MURPHY, P. J., and CARRO, J., concur with FEIN, J.; SANDLER and ROSS, JJ., dissent in an opinion by SANDLER, J.

Judgment, Supreme Court, Bronx County, rendered on November 10, 1983, reversed, on the law and the facts, the motion to suppress granted, and the indictment dismissed. The matter is remitted to the trial court for the purpose of entering an order in favor of the accused pursuant to CPL 160.50, not less than 30 days after service of this order upon the respondent, with leave during this 30-day period to respondent to move and seek any further stay of the implementation of CPL 160.50 as in the interest of justice is required.