■ THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v JIMMIE MONTAGUE, Respondent.—Order, Supreme Court, New York County (Richard D. Carruthers, J.), entered April 18, 1989, which granted defendant's motion to suppress physical evidence, unanimously reversed, on the law and on the facts, the motion denied and the matter remanded for further proceedings.

On October 19, 1988 at approximately 10:30 P.M., four New York City police officers, in uniform but driving an unmarked car, spotted defendant and a group of four other people "hanging out" opposite a building notorious for drug trafficking. Upon approach of the police car, the group dispersed. Defendant, heading in a different direction from his companions, was walking "at a quick pace" and kept looking "very nervously" at the officers. One of them, Officer Callan, who wished to question defendant as to whether he had seen any drug sales on the block, backed the car up to defendant and the four officers then exited the car.

Officer Callan and Sergeant Bessler were the first to approach defendant. Callan testified that his gun was holstered at this time and that someone may have asked defendant "[w]hat are you doing?" Defendant reached into his front waistband. Fearing that defendant was armed, Callan grabbed defendant's arm while it was still in his waistband. Defendant attempted to push Callan away but while Callan was struggling with him, Bessler reached into defendant's waistband and pulled out a .38 caliber revolver, which was loaded with six live rounds. Defendant's hand was still on the weapon when Bessler retrieved it. Defendant was arrested and taken into custody.

After a hearing, the court granted defendant's motion to suppress the revolver and ammunition, holding that the movement of defendant's hand toward his waistband was an innocuous act which did not justify Callan's grabbing his arm and Bessler's reaching inside his pants. We reverse.

A police officer is entitled to make inquiries as long as he does not act in an unduly intrusive manner and as long as he

is not motivated by whim or caprice but by an "objective credible reason * * * not necessarily indicative of criminality". *(People v De Bour,* 40 NY2d 210, 223.) The inquiry intended here, a limited one, involved drug-related crimes in a known drug location. Thus, as the suppression court found, the officers acted properly in approaching defendant to inquire as to whether he had observed any drug activity in the vicinity of the building.

It is true that the officer's initial query focused on defendant's own activities rather than drug activity in the building. We do not, however, believe that it is necessary to decide whether such inquiry was justified by defendant's behavior, as the intrusion at this point was minimal and since defendant's response immediately escalated the encounter and warranted the more intrusive police action which followed. Moreover, in view of Callan's testimony that he was going to ask defendant if he had seen any drug sales on the block, it is likely that the question was merely preliminary to such an inquiry. In any event, as the suppression court noted, "[t]he possibly intrusive nature of the question put to [defendant] does not detract from the fact that the police had the right to approach him in the first instance."

Thus, the primary focus should be on the events which rapidly unfolded after the officers approached defendant. It was at that point that defendant reached into his front waistband, Callan grabbed his arm and Bessler, after a brief struggle, reached inside the waistband and grabbed the gun. We find the officers' responses to defendant's movement entirely reasonable, especially in light of the fact that defendant was across the street from a known drug location where both drug and gun arrests had been made, was walking at a "quick pace" and looking "very nervous", and "kept looking back" at the police officers. Indeed, it would have been irresponsible for the officers to have failed to respond. We can hardly ignore what is apparent to probably every police officer, that a handgun is often carried in the waistband. *(See, People v Benjamin,* 51 NY2d 267, 271.) As has often been said, it is not required that an officer "await the glint of steel before he can act to preserve his safety" *(supra,* at 271). Although said in a different context, it is equally apt here that the Constitution "is not a suicide pact." *(Kennedy v Mendoza-Martinez,* 372 US 144, 160.)

The suppression court's reliance on *People v Allen* (109 AD2d 24) is misplaced. In *Allen,* upon emerging from an elevator in a building in a high crime area, plain clothes

police officers searching for a fugitive came upon Allen standing in the hallway, facing the elevator. When Allen stepped back and " 'put his hand to his right side pocket' " *(supra,* at 25), one of the officers grabbed his hand and felt a gun. In granting suppression, this court noted that there was no indication that Allen was the fugitive and no basis for a suspicion that he was armed. *(Supra,* at 26.) While Allen's equivocal actions were equally susceptible of an innocuous interpretation, such a conclusion cannot be reached on the facts involved here, where defendant manifested his awareness of the police, made an initial attempt to evade them, and, when directly confronted, placed his hand in his waistband, a telltale hiding place for a gun. Under the circumstances of this case, it would be unreasonable to require the officers to assume the risk that defendant's conduct was not innocuous. *(See, People v Benjamin,* 51 NY2d, *supra,* at 271.) Concur—Sullivan, J. P., Milonas, Wallach, Ross and Kassal, JJ.