THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v
JEREMY GRANT, Appellant.

First Department, November 20, 1990

APPEARANCES OF COUNSEL

*Noah Lipman* for appellant.

*Alexei Schacht* of counsel *(Norman Barclay* on the brief; *Robert M. Morgenthau, District Attorney,* attorney), for respondent.

## OPINION OF THE COURT

ELLERIN, J.

The facts giving rise to defendant's conviction of criminal possession of a weapon in the third degree are as follows: Shortly after 11:30 A.M. on March 4, 1989, Police Officer Kieran Breen and his partner were on routine patrol in a marked radio motor patrol vehicle proceeding eastbound on 141st Street when a vehicle traveling in the opposite direction was brought to Breen's attention by his partner, Officer Planeta. On direct examination at the *Mapp* hearing, Breen testified that he felt that the vehicle was unusual because there was no front license plate, the rear plate contained a letter "Z", indicating a rental car, but that the car was not a new car as would usually be the case with rental cars. On cross-examination he could neither remember the model of the vehicle, conceding that it could have been as late as a 1986 model, nor could he recall whether, in fact, the license plate was a New York plate. In any event, after observing the car, the police vehicle made a U-turn and followed the car for several blocks until it reached Hamilton Terrace near 143rd

Street. At that point, while the followed vehicle was still moving, defendant, who was a passenger, opened the car door and jumped out of the vehicle clutching at his waist. Immediately upon seeing defendant exit from the moving vehicle, Officer Breen, who thought "that could be a gun", although he acknowledged that he never observed a bulge or weapon at defendant's waist, immediately left the police car with his gun drawn and pointed at defendant. He ordered defendant to stop, and to "get to the steps" of a nearby building. Defendant, instead, began to run in the opposite direction followed by Officer Breen with his weapon drawn. After being pursued in this manner for some two blocks, defendant threw a pistol to the sidewalk and continued to run. The weapon was recovered by Officer Breen and defendant was ultimately arrested by Breen's partner Officer Planeta who had continued to chase defendant in the police car. At the hearing, Officer Breen conceded that he had never seen defendant before and that no radio report had been received regarding the possibility of criminal activity in the vicinity involved.

■■ The hearing court fully credited Officer Breen's testimony, a finding which we find no reason to disturb. Based upon this testimony, the hearing court found that, as a matter of law, Breen's pursuit of the defendant was reasonable at its outset, and that defendant's "disposal of the gun was not a spontaneous reaction to the police but was an independent act of abandonment involving a calculated risk". We find, to the contrary, that the record at the hearing does not support either of those findings.

■ The police officers' suspicions here were said to be aroused by their observations of the characteristics of the car in which defendant was a passenger and by defendant's exit from the car, while it was still moving, clutching his waist. With nothing beyond those observations, Officer Breen, with gun drawn, immediately sought to effect a forcible stop and seizure of the defendant. In evaluating the propriety of that police action we must consider whether it was justified in its inception and whether or not it was reasonably related in scope to the circumstances which created the encounter. (People v De Bour, 40 NY2d 210; People v Cantor, 36 NY2d 106.) The necessary predicate for the forcible stop and detention of a particular person is a reasonable suspicion that such person has committed, is committing or is about to commit a crime. (People v De Bour, supra, at 223; CPL 140.50 [1].) The facts upon which Officer Breen acted can in no way be said to have

provided that necessary predicate. There had concededly been no report of any criminal activity in the vicinity nor was there any indication that defendant had been, was, or was about to be involved in any crime when he, a passenger, departed from the moving vehicle clutching at his waist. While the officer indicated that it was something about the vehicle that "did not look right" that had initially aroused interest, it is significant that no effort was made to stop or follow that vehicle and, it must be concluded, therefore, that the officers' subsequent actions were in response to the passenger defendant's own behavior in leaving the moving vehicle while clutching his waist.

Defendant's behavior, although somewhat unusual, was at best equivocal and readily capable of an innocent explanation —i.e., an individual suffering from some stomach discomfort— particularly since the officer acknowledged that he saw no bulge or weapon. While those circumstances were sufficient to provide the officer with an objective credible reason for approaching defendant to request information or, at best, may have been sufficient to provide the officer with a founded suspicion that criminal activity was afoot activating the common-law right to inquire, in either such case the defendant had the right not to answer or to walk or run away and in neither case would a forcible seizure and subsequent pursuit, as here took place, be permissible (see, People v Howard, 50 NY2d 583; People v Lawrence, 145 AD2d 375). We find, therefore, that the police action in the instant case was improper and unjustified both in the initial forcible stop and seizure of defendant and in the subsequent pursuit of him.

The issue remaining, and the one upon which we are in disagreement with the dissent, is whether the recovery of the gun discarded by defendant was tainted by the illegal police conduct, thereby requiring its suppression, or whether defendant's action in throwing away the gun can be said to be attenuated from that illegal police conduct.

The relevant principles governing a determination of the propriety of the seizure of evidence following unlawful police conduct are set forth in People v Boodle (47 NY2d 398). In Boodle, plain-clothes officers, in an unmarked police car, were investigating a homicide when they approached the defendant who had been standing on a street corner and was starting to walk away. The officers pulled up next to the defendant and requested that he step over to the car. They indicated that they wished to speak to him about the homicide and asked

him to get into the rear seat of the car. As the car drove away, an officer asked defendant if he was "clean"; the defendant answer "Yes" and was warned to keep his hands where the officer could see them. Later, as the car proceeded, the officer looked in the rearview mirror and saw defendant reach down with his left hand. Braking the car, the officer turned his head and saw defendant throw an object, recognized as a gun, out of the window. In finding that, under those facts, defendant's act of throwing the revolver was not tainted by the prior unlawful police conduct, the court (at 402, 403) distinguished between evidence revealed "as a direct consequence of the unlawful police action" which requires suppression and cases where, after being unlawfully seized "a defendant has, independent of the illegality, revealed evidence", in which event the connection between the lawless conduct of the police and the discovery of the challenged evidence is so attenuated as to dissipate the taint. In concluding (at 404) that the defendant Boodle "in seeking to rid himself of the weapon, did not respond directly to the illegal police action", it was emphasized that the encounter had initially begun on the street and continued when the defendant entered the police car which began to drive away. In that factual context, defendant's act was found not to be a spontaneous reaction to a sudden and unexpected confrontation with the police, but was rather an independent act, involving a calculated risk during which he had the time to make a choice, as the result of thought and reflection.

In distinction, in *People v Wilkerson* (64 NY2d 749), where the defendant reached for his gun immediately after an unlawful police stop, the court reversed a finding that the taint of unlawful police conduct had been dissipated. It held that in making a determination as to whether the evidence is discovered as a direct consequence of the unlawful police conduct, the test to be applied "is whether defendant's action * * * was *spontaneous and precipitated by the illegality* or whether it was a calculated act not provoked by the unlawful police activity and thus attenuated from it" *(supra,* at 750; emphasis added).

The application of this test in the context of an illegally initiated police chase was discussed in *People v Torres* (115 AD2d 93). Justice Carro, writing for this court, aptly noted in that regard that:

"In performing the difficult task of drawing a distinction between spontaneous and calculated acts, we must be guided

by the principle that a presumption exists against the waiver of constitutional rights. *(People v Howard,* [50 NY2d] at p 593.) Courts, therefore, should conclude that an abandonment has occurred only in the clearest of cases. Indicative of a spontaneous response to unlawful police behavior are instinctual, rather than thought-out, reactions provoked by the coercive pressure of the illegal conduct. This coercion negates the ability to make a thoughtful decision involving the conscious assumption of a risk.

"Thus, in *Howard (supra),* after being unlawfully approached and then pursued into a basement of a building and after reaching a locked door, defendant dropped or threw a package he was holding which contained a gun. The court concluded that defendant's act of dropping or throwing the package was not an act ' "involving a calculated risk" ' but was 'a spontaneous reaction to the necessity of evading his pursuers'. *(People v Howard, supra,* at p 593.) Similarly, this defendant, under the pressure of an unlawful hot pursuit, ran into an alley only to find himself fenced in with a number of policemen breathing down his neck. As he reached the fence, he threw the gun over it and was then seized by Officer Rodriguez. It is only realistic to assume that defendant's actions were precipitated by an instinctive drive to escape his pursuers rather than a reflective, intellectual formulation of strategies. As in *Howard,* defendant's act was a provoked and spontaneous response to unlawful police conduct, requiring suppression of the gun." *(Supra,* at 99.)

In the instant case, defendant's act of dropping his gun in the course of being pursued by the police officers was no less a spontaneous reaction precipitated by the illegal police action. The kaleidoscopic continuum of events commencing with defendant's initial encounter with the police officer who at gunpoint illegally ordered him to stop, his immediate flight in response to that order and the continuation, without surcease, of that flight with the police in "hot pursuit" up to the time of defendant's ultimate apprehension, did not provide the opportunity for defendant to make a conscious calculated choice to drop the gun, based upon reflective thought but, instead, in that setting the abandonment of the weapon must be held to have been a spontaneous reaction precipitated by the police conduct. The dissent concludes that because defendant had traversed almost two blocks prior to discarding the gun, there was a time period sufficient for him to "reflect and formulate a strategy". However, the time for reflection is not

measured in minutes or seconds, it is measured in facts. Dependent upon those facts, action may well be "spontaneous" even though not taken immediately upon the arrival of the police, so long as it is a direct result of precipitous and unlawful police conduct and is not a calculated act independent of that police action. *(People v Boodle, supra,* at 403-404.) In *Boodle,* where the defendant's initial conversational encounter with the police began on the street and continued after he entered the police car which began to drive away, he had sufficient time to reflect and formulate an independent plan to rid himself of the weapon. In distinction, under the circumstances here, the frenetic activity of running two blocks while being chased by police cannot be said to have afforded time for a rational calculation of strategy, independent of the unlawful police action which precipitated and continued the chase during which defendant discarded the gun while actively attempting to evade his pursuers. It is clear that it was the coercive pressure of the police action that provoked defendant's spontaneous reaction with respect to the gun and negated his ability to make that decision as a result of thought and reflection. *(People v Howard,* 50 NY2d 583, *supra; People v Torres, supra; People v Archie,* 136 AD2d 553; *People v McFadden,* 136 AD2d 934.) Since we find that the gun in this case was disclosed as a direct consequence of the unlawful police action, the order denying the motion to suppress must be reversed and suppression of the gun granted.

Judgment, Supreme Court, New York County (Jay Gold, J.), rendered July 19, 1989, which convicted defendant, upon his plea of guilty, of criminal possession of a weapon in the third degree and sentenced him to five years' probation, reversed, on the law, the motion to suppress granted, and the indictment dismissed.

SULLIVAN, J. P. (dissenting). On March 4, 1989, at about 11:30 A.M., Police Officer Breen and his partner were on radio patrol in a marked patrol car, on 141st Street between St Nicholas and Edgcombe Avenues in Manhattan. After they noticed that the car in which defendant was a passenger was missing a front license plate, had a rear "Z plate", which they knew was often indicative of a rental car, and "wasn't a late model car" as rental vehicles usually are, they made a U-turn and followed the car. After following for several blocks, the officers' suspicions were further aroused by defendant's exit from the car while it was still moving "like it wasn't going to

stop". Defendant jumped out of the car clutching his waist, without closing the door, and the driver continued on. Thinking that defendant's clutching motion might mean that he had a gun, Officer Breen, who had been sitting in the passenger seat of the police car, exited the vehicle, drew his revolver and ordered defendant to stop. After looking at Breen, defendant ran in the opposite direction from that in which the police car was traveling. Breen chased defendant on foot for about two blocks, at which point defendant dropped a gun, which Breen stopped to retrieve. Breen's partner, who continued to pursue defendant, first in the patrol car and then on foot, apprehended defendant a few minutes later in a nearby park.

Even assuming, arguendo, that the police officers' pursuit of defendant was unjustified, we agree with the hearing court nevertheless that the gun discarded by defendant during his flight from the police officers should not be suppressed. The test to be applied in determining whether evidence is discovered as a result of unlawful police conduct and must therefore be suppressed is whether the defendant's action in ridding himself of the evidence was a spontaneous reaction precipitated by the illegality of the officers' conduct or a calculated act unprovoked by and attenuated from the illegality. *(See, People v Boodle,* 47 NY2d 398, 402, *cert denied* 444 US 969; *People v Wilkerson,* 64 NY2d 749, 750.)* Here, defendant concedes that he dropped the gun after being pursued by police officers for about two blocks. In this period he clearly "had time enough to reflect and formulate a strategy for ridding himself of the incriminating evidence". *(People v Boodle, supra,* at 404.) Thus, his disposal of the gun was an "independent act involving a calculated risk" which was not a direct response to the police conduct. *(People v Boodle, supra,* at 404; *see also, People v Graham,* 149 AD2d 588, in which the court denied the defendant's motion to suppress a glove which he dropped as he entered a police car about four minutes after he was approached by the police.)

Defendant's reliance on *People v Howard* (50 NY2d 583, *cert denied* 449 US 1023) is misplaced. In *Howard,* the defendant held on to a vanity case containing incriminating evidence while being pursued by police. He discarded it only after his pursuers cornered him in a basement as he was looking for a means of escape. Under such circumstances, the court held, the defendant's act in dropping the case while seeking to open or break down the basement door and window was not an act " 'involving a calculated risk' rather than a spontaneous

reaction to the necessity of evading his pursuers"; nor could it be said "that he purposefully divested himself of possession of the vanity case". *(Supra,* at 593, citing *People v Boodle, supra,* at 404.)* In *People v Torres* (115 AD2d 93, 99), upon which the majority relies, the fact that the defendant was cornered by the police was critical to the court's determination. Here, in contrast, defendant dropped the gun after being pursued by Officer Breen for two city blocks, by which time the latter was losing ground. It is thus clear that defendant's act of discarding the gun was the result of a purposeful and conscious decision and not an instinctive or spontaneous reaction to police conduct.

Thus, the judgment of conviction should be affirmed.

CARRO and ROSENBERGER, JJ., concur with ELLERIN, J.; SULLIVAN, J. P., and RUBIN, J., dissent in a separate opinion by SULLIVAN, J. P.

Judgment, Supreme Court, New York County, rendered July 19, 1989, reversed, on the law, the motion to suppress granted, and the indictment dismissed.