[647 NYS2d 4]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v RONALD GILES, Appellant.

First Department, September 5, 1996

APPEARANCES OF COUNSEL

*Isaac D. Hurwitz* of counsel *(Daniel L. Greenberg,* attorney), for appellant.

*Jonathan J. Faust* of counsel *(Ilisa T. Fleischer* on the brief; *Robert M. Morgenthau, District Attorney* of New York County, attorney), for respondent.

## OPINION OF THE COURT

MILONAS, J.

We are presented with yet another permutation of a late-night street confrontation between the police and a private citizen, an unexpected encounter occurring on routine patrol that resulted in the discovery of a gun in defendant's possession. These particular events unfolded in the following fashion. Shortly after midnight on a hot August night, three plain-clothes police officers driving westbound on 145th Street in an unmarked car noticed defendant walking westbound in the middle of the two-way street, between the lanes of opposing traffic. He was wearing a heavy winter jacket that reached almost to his knees (the same one he was wearing at the late November suppression hearing). They observed him reach under the jacket and make a motion as if adjusting something in the rear of his waistband. Seeing this, Officer Moran, the driver, continued westbound until he was almost alongside defendant, who turned, looked at the officers and then quickly crossed the street, narrowly avoiding being hit by a vehicle proceeding eastbound. Defendant proceeded to walk along a row of parked cars, still in the street. Officer Moran drove across the lane of eastbound traffic and stopped the car, facing the wrong way. As he jumped out of the car and announced "police," defendant put his hand towards the rear of his waistband. Officer Moran immediately reached out, grabbed defendant's hand and felt a gun in the rear waistband under the jacket. He recovered a loaded .38 caliber revolver.

In determining whether, from the inception of the police conduct and at each ensuing stage of the encounter, the degree of intrusion was warranted, we must apply the four-tier test articulated in *People v De Bour* (40 NY2d 210, 223) and reaffirmed in *People v Hollman* (79 NY2d 181). In order to approach an individual for the purpose of requesting information, a police officer must possess an "objective, credible reason, not necessarily indicative of criminality" (*People v Hollman, supra,* at 184). As clarified by *Hollman,* the information requested might include identification, destination and the reason for the individual's presence in the area; *Hollman* made plain that the information sought is not meant to be wholly unrelated to the individual and his or her circumstances, as

the nature of this inquiry was sometimes misconstrued after *De Bour* (79 NY2d, *supra,* at 189).

Beyond this first tier of permitted police contact is the common-law right of inquiry, which requires "a founded suspicion that criminal activity is afoot and permits a somewhat greater intrusion" (*People v De Bour, supra,* at 223). The third tier, authorizing a forcible stop and detention, requires that the police have a "reasonable suspicion that a particular person was involved in a felony or misdemeanor" (*People v Hollman, supra,* at 185). At the fourth tier, where the police have probable cause to believe a person has committed a crime, they may make an arrest (*People v Hollman, supra,* at 185).

Measuring this encounter against the four-tiered test, we conclude that defendant's conduct was sufficient to entitle Officer Moran to approach defendant and request information (*People v Hollman, supra*). Defendant was first observed walking down the middle of a two-way street, i.e., between lanes of opposite-moving traffic. This constitutes more than "odd" behavior, which alone may not justify police intrusion (*People v Cornelius*, 113 AD2d 666). It is, in fact, dangerous behavior, both to the pedestrian and those driving. The fact that defendant was wearing a long winter coat on a hot summer night, standing alone, is no more than "odd" behavior, but, when taken together with the motion of adjusting an object in the rear of his waistband—where, it has been recognized time and again, a handgun is often hidden (*People v Benjamin*, 51 NY2d 267, 271; *Matter of Clarence W.*, 210 AD2d 71, 72, *lv denied* 86 NY2d 709; *People v Jenkins*, 209 AD2d 164, 165; *People v Montague*, 175 AD2d 54, 55)—it assumes another possible meaning, i.e., that the inappropriate garb is worn for the very purpose of hiding something. These factors together gave rise to an objective, credible reason, not necessarily indicative of criminality, for Officer Moran to approach defendant.

An objective, credible reason may be predicated upon conduct as minimal as walking in a known drug location, holding a "dark, opaque plastic bag" close to one's body (*People v Diaz,* 180 AD2d 415, 416, *affd* 80 NY2d 950). In *Diaz (supra,* at 416), as here, defendant argued that there was no " ' "founded suspicion that criminal activity [was] afoot" ' " to justify a common-law right of inquiry. However, there was no actual inquiry in either case because of each defendant's response to the approach by the police. In *Diaz*, too, the police first followed defendant in their car, making a U-turn to stay with him as he crossed the street.

We have similarly found an objective, credible reason to approach and seek information based only upon an observation that a defendant, standing with several others at a known drug location, began to walk away as an unmarked police car approached and looked " 'nervously' " at the uniformed officers several times (*People v Montague, supra,* at 54). When four officers got out of the car, and one asked what he was doing, defendant reached into his front waistband. This was a minimal police intrusion met by a response that immediately "escalated" the encounter and warranted more intrusive action *(supra,* at 55). In the case before us, only one officer got out of the car—a far less "threatening" circumstance—and simply identified himself before defendant's conduct similarly "escalated" the situation. In both instances, it was proper for the officer to reach out and grab defendant's hand (*People v Montague,* 175 AD2d, *supra,* at 55). Notably, the officer's reaction was limited to the conduct that prompted it: Moran, who only moments before had seen defendant adjust an unseen object in his rear waistband, did nothing more than grab defendant's hand; he did not draw his weapon or otherwise touch or physically restrain defendant. Nor at any time prior to that had Moran touched or drawn his gun or issued a command (*compare, People v Wilson,* 201 AD2d 399; *People v Soto,* 194 AD2d 371; *People v Taveras,* 155 AD2d 131, *appeal dismissed* 76 NY2d 871).

Moreover, the mere announcement of "police," uttered upon Officer Moran's getting out of the car, without more, is not tantamount to intimidation such that the encounter, by this single word of identification, became a tier two intrusion. We are well aware that the distinction between the two levels is itself subtle, and that, as explained in *Hollman,* it is "certainly unsettling to be approached by a police officer and asked for identification." *(Supra,* at 192.) In such circumstances, a reasonable person might well be "taken aback" (79 NY2d, *supra,* at 192). The distinction rests upon the content and number of questions, and "the degree to which the language and nature of the questions transform the encounter from a merely unsettling one to an intimidating one" (79 NY2d, *supra,* at 192). While defendant may have found it "unsettling" to find himself confronted by a police officer, no such transformation occurred in the split second before defendant reached toward his rear waistband for the second time.

Of particular relevance to this assessment is the fact that the officer in *Diaz,* whose shield was, like Moran's, hanging

around his neck, approached that defendant with "his hand held over his gun, noticeable at his waist" (180 AD2d, *supra,* at 416). If this factor did not transform a tier one intrusion into at least a tier two intrusion, then Officer Moran's announcement of "police" can hardly do so. In this regard, it is also relevant that Moran alone exited the car, whereas in *Diaz* both officers did (and, in *People v Montague, supra,* four uniformed officers exited the car). Notably, in affirming *Diaz,* the Court of Appeals said that not only was the initial approach justified, but the officer's hand on his gun was not by itself sufficient to raise the encounter to a second level stop (80 NY2d, *supra,* at 952).

Finally, we note that defendant's conduct in crossing the street "quickly" does not constitute flight in these circumstances, nor does the police conduct in following defendant in the car and then getting out of the car rise to the level of pursuit; as noted above, the police conduct in *Diaz* was similar and included the presence of two officers. And, even considering all of Moran's conduct, including the announcement of "police," it did not constitute a seizure. Indeed, if an actual command to "stop" by a uniformed police officer as an individual is walking away does not constitute a seizure, as the Court of Appeals explicitly found in *People v Bora* (83 NY2d 531), then the announcement of "police" by a plain-clothes officer cannot be said to rise to that level.

Typically, no single factor will justify the police conduct under scrutiny; rather, it is the peculiar combination of factors known to the police at the time, and as circumstances evolve, that will determine the appropriate level of intrusive conduct. Because Officer Moran possessed an objective, credible basis for approaching defendant, and did nothing to exceed the first tier of police intrusion until defendant's furtive move, suppression was correctly denied.

Accordingly, the judgment of the Supreme Court, New York County (Murray Mogel, J.), rendered January 27, 1994, convicting defendant, upon his plea of guilty, of criminal possession of a weapon in the third degree and sentencing him to a term of five years' probation, is affirmed.

MURPHY, P. J., WALLACH, ROSS and NARDELLI, JJ., concur.

Judgment, Supreme Court, New York County, rendered January 27, 1994, affirmed.