■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v KUSHON POWELL, Appellant. [667 NYS2d 725] —Judgment, Supreme Court, New York County (Jay Gold, J., at hearing;

Carol Berkman, J., at plea and sentence), rendered November 13, 1996, convicting defendant, upon his plea of guilty, of criminal possession of a weapon in the third degree, and sentencing him to a term of 3 years, reversed, on the law, the gun recovered from defendant and his second statement to the police are suppressed, the plea vacated, and the matter remanded for further proceedings.

On March 27, 1996 at approximately 2:30 P.M., police officers Ramos and Bonet and Sergeant Lippi were on plainclothes anti-crime patrol when they noticed defendant walking north at a "quick pace" near 112th Street and First Avenue. From their unmarked police car, approximately 10 to 15 feet away, the officers observed defendant, who was wearing a waist-length leather jacket, make an adjustment to the right side of his waistband. After responding to an unrelated radio transmission, the officers returned to the area 10 minutes later and observed defendant walking at the same quick pace near 121st Street and Second Avenue. The defendant's left arm was swinging freely but his right arm was held stiffly against his body.

The unmarked car pulled over toward the curb and Officer Bonet identified his team as police and called defendant over. Defendant hesitated and looked around, and after Bonet repeated his request, defendant complied. Bonet asked defendant if he had any identification, where he was going and why he was in the area. Defendant responded, in a nervous manner, that he had no identification and was going "to the school." The officers acknowledged at the hearing that a college is located at 124th Street and Second Avenue, and that defendant's route was consistent with his statement. When Bonet asked defendant whether he needed a school ID to get into the school, defendant hesitated and was unable to answer. Bonet and Ramos exited the car and stood on either side of defendant. Then, "[j]ust for my safety to make sure [defendant] didn't have anything," Bonet patted the right side of defendant's waistband. Feeling the outline of a gun, Bonet reached in and recovered a loaded .38 caliber pistol.

During the ride to the precinct, one of the officers told defendant "you got caught with a gun, just take it easy," and defendant responded that he carried the gun because someone had put a contract out on him. Two hours later, after defendant received his *Miranda* warnings, another detective, who was unaware of the earlier statement, questioned defendant and elicited a similar statement.

The suppression court concluded that the initial stop was justified by the speed in which defendant was walking, the

high-crime area involved and the arm movements by defendant which suggested to the officers that defendant might be carrying a gun. The court further ruled that those circumstances, when combined with defendant's answers to the officer's questions, "were sufficient to justify a minimal touching of defendant's waistband" which was "the least intrusive search feasible."

The pivotal legal determination to be made in this case is whether the police had reasonable suspicion of criminal activity so as to justify the patting of defendant's waistband. Our assessment of the police conduct is of course guided by the four-tier test enunciated by the Court of Appeals in *People v De Bour* (40 NY2d 210), and reaffirmed in *People v Hollman* (79 NY2d 181). "In evaluating the propriety of * * * police action we must consider whether it was justified in its inception and whether or not it was reasonably related in scope to the circumstances which created the encounter. (*People v De Bour*, 40 NY2d 210; *People v Cantor*, 36 NY2d 106.)" (*People v Grant*, 164 AD2d 170, 172, *appeal dismissed* 77 NY2d 926.)

With respect to the initial stop and inquiry of the defendant, we focus on the first and second levels of the *De Bour* analysis. The first level of permissible police authority, the right to request information, exists when an officer possesses an "objective credible reason * * * not necessarily indicative of criminality" (*People v De Bour*, *supra*, at 223; *People v Hollman*, *supra*, at 184; *People v Giles*, 223 AD2d 39, 40, *lv denied* 89 NY2d 864). The second level, the common-law right of inquiry, "is activated by a founded suspicion that criminal activity is afoot and permits a somewhat greater intrusion" (*People v De Bour*, *supra*, at 223). We need not analyze the distinction between these two levels of intrusion (*see*, *People v Hollman*, *supra*), however, because we find that the officer's questioning in this case never exceeded a limited request for information. The questions asked by Officer Bonet concerned defendant's identity, destination and reason for being in the area—subjects expressly found by the *Hollman* Court to be within the parameters of a first-level request for information (*supra*, at 191). Since the officers' observations of defendant provided an objective, credible reason to request information, we agree with the suppression court that the stop and inquiry was justified (*see*, *People v Dawkins*, 201 AD2d 336, 336-337, *lv denied* 83 NY2d 851).

Our analysis departs from that of the suppression court, however, regarding the subsequent actions taken by the police. "The necessary predicate for the forcible stop and detention of

a particular person is a reasonable suspicion that such person has committed, is committing or is about to commit a crime. (*People v De Bour, supra*, at 223; CPL 140.50 [1].)" (*People v Grant, supra*, at 172.) Assuming this predicate is met, a frisk of the detainee is authorized if the officer reasonably suspects that he or she is in danger of physical injury (CPL 140.50 [3]). Neither predicate was met in this case.

The People argue that the totality of circumstances—the defendant's quick pace, his adjustment to his waistband during the initial police observation, his walking with arm stiffly against his body during the second encounter, the high-crime nature of the area and his inconsistent and evasive responses during the police questioning—provided the officers with a reasonable suspicion that defendant was in possession of a gun. We disagree. Defendant's actions were at all times innocuous and readily susceptible of an innocent interpretation (*People v De Bour, supra*, at 216; *see, People v Howard*, 147 AD2d 177, 179-180, *appeal dismissed* 74 NY2d 943; *People v Silvestre*, 119 AD2d 601, 601-602; *see also, People v Moore*, 176 AD2d 297, 298-299), and, as such, may not generate a founded suspicion of criminality (*People v De Bour, supra*, at 216). While the officers testified at the hearing that in their experience such actions suggested that defendant was carrying a concealed weapon, one officer also conceded that the object could just as easily have been something as innocuous as a newspaper (*see, People v Howard, supra; People v Silvestre, supra*). Notably, no officer testified that he observed the outline of a gun, a waistband bulge or any other telltale sign of weapon (*People v De Bour, supra*, at 221; *see also, People v Grant, supra; People v Howard, supra*).

Nor did defendant's verbal responses provide a basis for any greater intrusion. The failure to have personal identification is not a crime, and defendant's statement that he was going to school was facially credible since there was a college a few short blocks away. Defendant's failure to respond to the question concerning a school ID, objectively viewed, was likely the product of confusion rather than evasion. Defendant never said he was a student, and there are many possible and legitimate reasons for his presence there. In light of the recognized "unsettling" aspect of a police-initiated inquiry of citizens (*People v Hollman, supra*, at 192; *People v Giles, supra*), we reject the People's suggestion that defendant's allegedly nervous reaction to this questioning authorized a greater intrusion. Additionally, that this may have been a high-crime area (we note that the evidence was weak on this point) could not itself validate

the search since no other objective indicia of criminality existed to supply the requisite reasonable suspicion for the forcible stop and frisk (*see, People v Howard, supra*, at 182; *People v Marine*, 142 AD2d 368).

To be distinguished are those cases where, after an initially proper stop and inquiry, a greater intrusion was warranted due to additional suspicious observations by the police or the attendant circumstances (*see, People v Benjamin*, 51 NY2d 267; *People v Giles, supra*; *People v Montague*, 175 AD2d 54). In these cases, while the information initially available to the police authorized, at most, their common-law right of inquiry, subsequent dangerous and indeed life-threatening movements by those defendants justified an immediate patdown for weapons. Such facts are plainly inapposite to the present case where defendant made no threatening gestures in the presence of the police, and no bulges or weapons were observed (*see, People v Rainey*, 228 AD2d 285, 287, *lv denied* 88 NY2d 1023).

While the suppression court properly suppressed defendant's first statement, made in the police car without the benefit of *Miranda* warnings, as the product of police inducement (*see, People v Lynes*, 49 NY2d 286, 294-295; *People v Maerling*, 46 NY2d 289, 301-302), it erred in denying suppression of defendant's post-*Miranda* statement made two hours later at the precinct. The court's finding that the statement was attenuated from the illegal arrest and the earlier statement is not supported by the record (*see, People v Harris*, 77 NY2d 434, 440-441; *People v Johnson*, 66 NY2d 398, 407-408; *cf., People v Conyers*, 68 NY2d 982). Concur—Wallach, J. P., Tom and Mazzarelli, JJ.

Nardelli and Colabella, JJ., dissent in a memorandum by Colabella, J., as follows: I agree with the majority that there was a sufficient predicate to stop and question defendant, but disagree with the majority's assessment that defendant's conduct was otherwise entirely innocuous. The reasonableness of police conduct must be viewed in the context of the totality of the circumstances (*People v Benjamin*, 51 NY2d 267, 271). In this case, while individual elements of defendant's conduct could be considered consistent with innocent behavior, a different inference could reasonably be drawn upon a collective assessment of such conduct. Accordingly, I vote to affirm.

The stiff positioning of defendant's right arm, in contrast to the freely swinging left arm, clearly indicated that defendant was carrying something concealed beneath his waist-length jacket. While this might, as the majority points out, have been something as innocuous as a folded newspaper, the majority

view fails to give sufficient weight to defendant's characteristic adjustment to the right side of his waistband. The officers recognized this movement from experience as consistent with concealment of a handgun.* "[I]ndeed it may almost be considered common knowledge" that "a handgun is often carried in the waistband" (*People v Benjamin, supra,* at 271).

The majority view also gives insufficient weight to the nature and location of the area in which defendant was observed. While location alone will not justify a search, "the nature and location of the area where a suspect is detained may be one of the factors considered in determining whether, in a given case, the police acted reasonably" (*People v Bronston,* 68 NY2d 880, 881; *People v Howard,* 147 AD2d 177, 182, *appeal dismissed* 74 NY2d 943). The majority decision, however, merely indicates that the area "*may* have been a high-crime area", noting that the "evidence was weak on this point" (emphasis added). I find no basis to dispute the officers' testimony, based on their experience, that the area was, in fact, a high-crime area known for narcotics and weapons.

Further, the majority decision underplays defendant's conduct when confronted. After the officers identified themselves as police officers, and asked defendant to approach the vehicle, defendant hesitated, stopped and looked to his left, right and across the street. Such behavior was consistent with a contemplation of flight.

It was only after defendant was called a second time, and after again hesitating, that he complied with the officers' request. When asked if he had identification and where he was going, he replied he had no identification and was going to school. The credibility of this explanation, however, was cast in doubt by the fact that he had no books, and was unable to explain how he planned to enter the school without identification. At the same time, defendant appeared to become "unnerved" and "frustrated". It was only at this point, fearing for his safety, that one of the officers patted defendant's waistband. "[A]ny further request for information * * * might well [have been] answered by a bullet" (*People v Stone,* 86 AD2d 347, 350, *affd* 57 NY2d 762, *cert denied* 459 US 1212).

Under the totality of the circumstances—defendant's quick pace, his adjustment to his waistband during the initial police observation, his walking with one arm stiffly against his body during the second encounter, the high-crime nature of the area

---

* The three officers had made between 100 and 200 arrests each, including an average of 40 arrests each involving illegal guns, during more than 30 cumulative years in law enforcement.

and his inconsistent and evasive responses to the police questioning—there was at least a founded suspicion that criminal activity was afoot, authorizing a common-law right of inquiry (*People v Rodriguez*, 207 AD2d 669). In such cases, where the officer, in furtherance of his common-law right of inquiry, has valid concerns for personal safety, we have permitted minimal intrusions (*People v Chin*, 192 AD2d 413, *lv denied* 81 NY2d 1071). Here, the patdown of the right side of defendant's waistband, which revealed the weapon, was minimally intrusive and limited in scope to the area of defendant's person under suspicion (*Matter of Edwin C.*, 240 AD2d 348; *People v Chin, supra*; *cf., People v Williams*, 160 AD2d 397, 398).

As to defendant's statement at police headquarters, since the search of defendant was warranted, the statement in question is not the fruit of an unlawful search (*People v Damiano*, 87 NY2d 477, 486-487). Furthermore, I would find that the statement, which was made after *Miranda* warnings, was sufficiently attenuated from any illegality with respect to his initial statement two hours before without the benefit of *Miranda* warnings.