Appellant, who was 14 years old at the time of the incident, was observed by the police at approximately 9:35 p.m. in a drug-prone location, wearing a backpack. When the police first spot *404 ted him, they were in a car and he was walking slowly down a sidewalk. Appellant then passed between two parked cars, peering up and down the street, and then passed back between the cars and looked up and down the sidewalk. Appellant stepped back onto the sidewalk, looked around and began pacing in a circle very slowly. He took out his cell phone and used it for about 30 seconds, put it back in his pocket, and then went back between the cars. He repeated the pacing and looking a second time. Appellant then took off his backpack and placed it on the ground between the cars. He kneeled down and removed a white object very slowly and gently from his waistband, placing the object in an outer pocket on the side of the backpack. He used one hand to grip the object and the other to hold the waistband, making it appear to the observing officers that he did not want the object to get caught in his pants and that he was trying to remove the object as quickly, but as carefully, as possible. Appellant placed one hand on the pocket of the backpack and used the other hand to place the object inside the pocket. He zipped up the pocket, put, the backpack on his shoulder, and crossed the street. The police thought the object “could” have been a firearm because of the way appellant was handling it and because it was in his waistband, the most common location for carrying a gun. However, by the officers’ own admissions, nothing about the appearance of the object which appellant placed in the backpack supported that suspicion.
One of the officers got out of the car and walked side by side with appellant. The officer saw that appellant’s backpack seemed to be bottom-heavy. The officer identified himself and told appellant to walk with him across the street. Appellant replied, “[WJhat do you want from me? I am only fourteen.” Another officer went to appellant’s right, and the one who originally approached him frisked his waistband and patted down his pockets. When asked where he was coming from, appellant replied that he was coming from his uncle’s house. When asked where he was going, appellant stated, “I don’t know. I am going here,” and showed an address written on his forearm which was located in a housing development in the South Bronx, and which the police knew to be a high-crime, drug-prone location. The first officer, upon smelling marijuana, asked appellant if he was in possession of any. Appellant said, “[N]o.” The officer asked if appellant had ever been in trouble with the law, and he answered, “No. This is the first time.” When the officer asked what was in the backpack, appellant replied, “[NJothing.”
The officer took the backpack by the upper strap handle at *405 the top and shook it a little. He asked appellant why the bag was so heavy and what was in it. Appellant again replied that there was nothing in the backpack. The officer believed that appellant was lying because the bag was very heavy and he had previously seen appellant place something inside it. The officer asked for pedigree information, and appellant gave him his date of birth and first name. Appellant stated that papers bearing his name might be found among school papers and a folder in his backpack and stated, “You could check if it’s in any of those papers in my bag.” The officer told appellant to take off the backpack and hand it to him. Appellant placed the bag on the ground and the officer opened up the larger pocket and looked through the paperwork for something with appellant’s name on it, but was unsuccessful. He then opened the outer pocket, which contained no paperwork. However, the officer saw the object that he had seen earlier, a white bag. The officer placed his hand on the bag, which was hard and heavy. He stated that the object “could have been anything,” but it felt like a firearm. The officer placed appellant in handcuffs for his safety, and detained him so that he could determine the contents of the bag. Also, he considered appellant a flight risk because appellant was nervous, turning his head and leaning his body from side to side. When the officer opened the bag, he saw a firearm wrapped in bubble wrap, and placed appellant under arrest. Eleven rounds of ammunition were loaded in the magazine, and $963 in currency was also recovered from appellant’s jeans pocket.
The court denied appellant’s motion to suppress the gun. The court found that the search was justified by appellant’s presence at night in a high-crime neighborhood, his furtive actions such as peering up and down the street and sidewalk, and his removal of a white object from his waistband, which, in the officers’ experience, is where weapons are frequently concealed. The court noted appellant’s inability to tell the officers where he was going without first looking at an address written on his arm, and that the officers knew that address to be in a high-crime area. The court further observed that appellant did not have identification, did not give his full name, and suggested that the officer look for some papers in the backpack. The court also relied on the fact that the officer who searched the backpack testified that it was much heavier than it would have been had it contained only papers.
Upon the denial of his suppression motion, appellant admitted that he had committed an act which, if committed by an adult, would constitute the crime of criminal possession of a *406 weapon in the second degree. He was adjudicated a juvenile delinquent, and placed on enhanced supervision probation for a period of 15 months. He was also directed to obey his parents, attend school regularly, refrain from the use of drugs or alcohol, complete 60 hours of community service and have no gang affiliation or further difficulties at home or in the community.
In determining whether the encounter between the police and appellant ultimately justified the seizure of the weapon and appellant’s arrest, we rely on the four-tiered methodology enunciated by the Court of Appeals in People v De Bour (40 NY2d 210 [1976]). In De Bour, the Court delineated the various steps of justifiable intrusion: (1) an approach to request information based on some objective credible reason, not necessarily indicative of criminality; (2) the common-law right to inquire (short of forcible seizure), based on a founded suspicion that criminal activity is afoot; (3) a forcible stop and detention (and limited pat-down/frisk), based on a reasonable suspicion that a particular person has committed, is committing or is about to commit a crime; and (4) an arrest, based on probable cause to believe the person committed a crime (id. at 223).
Clearly, the police in this case were justified in taking the first two steps. Appellant’s seemingly furtive behavior at night and in a high-crime neighborhood provided a reasonable basis for the police to form a founded suspicion that appellant was engaged in criminal activity. This gave the officers the right to approach appellant and to make inquiries of him. However, the presentment agency argues that the police were justified in seizing appellant and then searching his bag because, based on the totality of the circumstances, the officers formed a reasonable suspicion that he was in possession of a weapon. These circumstances included appellant’s apparently furtive movements, his removal of an object from his waistband, the heavy appearance of his backpack after he placed the object inside it, and his denial that there was anything at all in the backpack.
“ ‘[Reasonable suspicion’ [to justify a seizure] has been aptly defined as the quantum of knowledge sufficient to induce an ordinarily prudent and cautious man under the circumstances to believe that criminal activity is at hand. The requisite knowledge must be more than subjective; it should have at least some demonstrable roots. Mere ‘hunch’ or ‘gut reaction’ will not do” (People v Sobotker, 43 NY2d 559, 564 [1978] [internal quotation marks and citations omitted]). This Court has specifically held that the mere fact that an officer sees a person holding something near his waistband is not enough to form a reasonable suspicion, “absent any indication of a weapon, such as the *407 visible outline of a gun” (People v Fernandez, 87 AD3d 474, 476 [2011]; see People v Manuel, 220 AD2d 263 [1995] [observation of large bulge under the defendant’s shirt above the waistband did not provide a reasonable basis to believe that the defendant was armed]; People v Barreto, 161 AD2d 305 [1990] [same], lv denied 76 NY2d 852 [1990]; see also People v Crawford, 89 AD3d 422, 423 [2011] [“Defendant’s flight, when accompanied by nothing more than the presence of an object in his pocket that was unidentifiable even at close range, did not raise a reasonable suspicion that he had a gun or otherwise was involved in a crime”]).
We reject the dissent’s implication that an officer’s suspicion that an unidentified object in, as opposed to near, a person’s waistband, is a gun, is always reasonable. This Court did not go that far in People v Alozo (180 AD2d 584 [1992]), which the dissent cites in support of that position. It is noted that in People v Mozo, this Court found that one of the factors justifying the frisk of the defendant was that “[t]he officer believed the item to be a gun because of its appearance” (id. at 586). Here, by contrast, the officers conceded that nothing about the appearance of the object which appellant pulled from his waistband revealed what it was. It is further noted that People v Benjamin (51 NY2d 267 [1980]), which, as the dissent points out, was cited by this Court in People v Alozo, found that a frisk was justified because the defendant there reached for his waistband and “[i]t would, indeed, be absurd to suggest that a police officer has to await the glint of steel before he can act to preserve his safety” (51 NY2d at 271). Here, there was no evidence that the officers ever felt that their lives were in danger by the possible presence of a gun.
Further, absent such an actual indication of a firearm, “other objective indicia of criminality” are necessary before a suspect may be seized (People v Powell, 246 AD2d 366, 370 [1998], appeal dismissed 92 NY2d 886 [1998]). Thus, in Powell, suppression of a gun was granted where the defendant, while walking at a quick pace, adjusted his waistband and walked with one arm held stiffly against his body, because those “actions were at all times innocuous and readily susceptible of an innocent interpretation” (id. at 369). On the other hand, in People v Rodriguez (71 AD3d 436 [2010], lv denied 15 NY3d 756 [2010]), suppression of a weapon was denied even though the police only observed that defendant’s waistband was weighed down by “a concealed object” (id. at 437). However, in Rodriguez, the defendant was stealthily approaching an apartment which was under surveillance as a known drug location and was a possible *408 target for a home invasion robbery. Further, the defendant was carrying latex gloves, which the police knew had been used in such armed robberies. Similarly, in Matter of Wilberto R. (220 AD2d 332 [1995]), cited by the dissent, the defendant, whose vest had a drooping pocket that this Court held the police justifiably believed contained a gun, closely matched the description of a person who a radio call had stated was carrying a gun. A similar description of suspects who had just fired weapons formed a predicate for the search in People v Flores (226 AD2d 181 [1996], lv denied 88 NY2d 985 [1996]), also cited by the dissent. Here, appellant had never been described to the police as being armed. Certainly the dissent would not argue that any person on the street, even in a high-crime area, is presumed to be carrying a weapon based only on a drooping pocket or backpack.
Reasonable suspicion could not be formed in this case based strictly on the officers’ observation of appellant removing an object from his waistband, because they conceded that the object bore no obvious hallmarks of a weapon. Further, there were no other objective indicia of criminality because there were plausible, noncriminal reasons for appellant’s behavior. For example, the fact that the backpack sagged at the bottom could have been the result of any number of things which it would have been legal for appellant to possess. Nor did appellant’s actions in pacing back and forth and peering up and down the street and sidewalk, and then kneeling down to transfer something into the backpack exclude the reasonable possibility that he was engaged in innocent behavior. The fact that appellant was in a high-crime area and on his way to another high-crime area does not, without more, constitute a factor sufficient to create reasonable suspicion (Powell, 246 AD2d at 369-370). Nor do we believe that all of these factors, taken together, reasonably lead to the conclusion that appellant was in the process of committing a crime.
Even if the seizure of appellant was legal, we find that appellant’s denials that there was anything inside the bag did not justify an increase in the level of suspicion such that the police properly searched his bag. In the cases on which the presentment agency and the dissent rely in arguing that similar lies can create probable cause, People v Febus (11 AD3d 554 [2004], lv dismissed 4 NY3d 743 [2004]) and People v Scott-Heron (11 AD3d 364 [2004], lv denied 4 NY3d 803 [2005]), the police had already developed strong reason to believe that the defendants had secreted drugs, and the defendants’ denials were found to have buttressed that belief. Here, as discussed above, the police *409 had no basis to believe that there was a gun in appellant’s backpack, other than their hunch. Appellant’s denials were insufficient, on their own, to create probable cause.
Finally, we find that the presentment agency failed to meet its heavy burden of establishing that appellant voluntarily consented to the search of the entire bag (see People v Barreras, 253 AD2d 369 [1998]). Based on the exchange with the officers, appellant’s reasonable expectation was that he had consented to a limited search of papers that might contain identifying information (see People v Gomez, 5 NY3d 416, 419 [2005]). When the officer opened a separate compartment in the backpack which did not contain any papers, the right to proceed further was lost. Concur — Mazzarelli, J.E, Renwick and Freedman, JJ.