People v Thorne (2022 NY Slip Op 03696)

People v Thorne

2022 NY Slip Op 03696

Decided on June 07, 2022

Appellate Division, First Department

MANZANET-DANIELS, J.P. 

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered: June 07, 2022
SUPREME COURT, APPELLATE DIVISION
First Judicial Department

Sallie Manzanet-Daniels
Angela M. Mazzarelli David Friedman Manuel Mendez

Ind. No. 3353/14 Appeal No. 15335 Case No. 2017-1546 

[*1]The People of the State of New York, Respondent,
v
Floyd Thorne, Defendant-Appellant.

Defendant appeals from the judgment of the Supreme Court, New York County (Bruce Allen, J. at hearing and plea; Maxwell Wiley, J. at sentencing), rendered March 3, 2016, convicting him, upon his guilty plea, of attempted robbery in the first degree, and sentencing him to a term of 3½ years.

Janet E. Sabel, The Legal Aid Society, New York (Ronald Zapata of counsel), for appellant.
Cyrus R. Vance, Jr., District Attorney, New York (Brent E. Yarnell and David M. Cohn of counsel), for respondent.

MANZANET-DANIELS, J.P. 

The arresting officers lacked the requisite reasonable suspicion when they conducted a level three stop of defendant, whose description matched that of a robbery suspect only in that he was a black male in the vicinity. We accordingly reverse and dismiss the indictment.
Defendant pleaded guilty to attempted robbery in the first degree after the suppression court denied his motion to suppress evidence following a forcible police stop. A radio run, entered into evidence at the suppression hearing, described the robbery suspect as a black male with a firearm on the corner of 81st Street and Third Avenue. The complainant was said to be in a Starbucks on 81st Street and Second Avenue. Later on, while police were canvassing the area, an officer asked the complainant if she could describe the suspect's clothing, and she stated that she didn't know what he was wearing. She described the suspect as a black male taller than she, perhaps five feet, eight inches. A few minutes later, an officer is heard on the recording describing the suspect as a black male with a baseball hat. Shortly after, an officer asked which way the suspect was traveling, and was informed that he was heading west on 81st Street. A little later, an officer asked whether the suspect had a goatee and was told "unknown." There was one mention of "dark clothing" at 10:06, with the context being inaudible in the transmission. Police stopped defendant at 86th Street and Lexington Avenue.
At the suppression hearing, Officer Seto testified that he and his partner received a radio dispatch at 1:46 a.m. of a 10-10 (that is, a flight in progress). According to Officer Seto, the complainant, whom they met at the Starbucks, described the suspect as a black male wearing all black clothing with a hat, and heading north; Officer Seto put the description over the radio. During this discussion, the complainant stated that she was uncertain whether the suspect had displayed a firearm.
The arresting officers Delgado and Metaxas testified that they received a 10-10 of a five foot, eight inch tall black male with a firearm wearing a baseball cap and dark clothing in the vicinity of East 81st Street and Third Avenue. They then observed defendant, who was wearing black pants, a light gray T-shirt, black sneakers, and a black backpack, proceeding north on Third Avenue and 84th Street. He was not wearing a baseball cap or other hat. The officers, who were following defendant in their vehicle [*2]at a very slow speed, radioed for a more specific description of the clothing worn by the suspect and to ask whether the suspect had a goatee, as defendant did. Officer Delgado testified that defendant was walking "fast and suspicious" and was "trying to hide his face" by looking into shop windows. Delgado further testified that defendant started talking to another pedestrian and "made a point" of changing his direction of travel. However, defendant crossed the street in front of the police vehicle while the officers were observing him and walked directly toward the officers as he approached the subway entrance—hardly the behavior of someone seeking to avoid contact with the police.
The officers exited their vehicle at Lexington and 86th Street and asked defendant whether they could talk for a minute. Defendant asked why they were stopping him, and Metaxas told him to put his hands against the wall. The officers grabbed defendant's arms, forced him to the ground, and placed him in handcuffs. As noted, defendant was wearing a light gray T-shirt, and he had a goatee and tattoos on his arm, neither of which was mentioned in the radio transmission. What is more, defendant was six feet, one inch, and five feet, eight inches as the complainant had described. It was only after being wrestled to the ground that the officers purported to see the outline of a gun. During a showup shortly thereafter, the complainant was unable to identify defendant as the perpetrator.
The suppression court credited the officers' testimony without addressing the inconsistencies with the radio run recording. The court recognized that the description given by the complainant "did not fully match" defendant but noted that "a suspect could easily remove his outer top and hat." The court further noted that defendant was observed walking rapidly from the scene toward the nearest subway station and was keeping his face turned toward the windows of closed stores, evincing a consciousness of guilt. Thus, the court found, under the totality of the circumstances, that the officers had reasonable suspicion to forcibly stop and frisk defendant. The hearing court granted defendant's motion for leave to reargue but stated summarily that it was adhering to its previous decision. Following denial of the motion, defendant agreed to plead guilty to attempted first-degree robbery in exchange for a sentence of 3½ years and 5 years' postrelease supervision. Defendant also executed a written appeal waiver.
As an initial matter, we find defendant's waiver of the right to appeal to be invalid. The oral colloquy, even considered in light of the written waiver, did not demonstrate that defendant had a "full appreciation of the consequences" of the waiver (People v Thomas, 34 NY3d 545, 560 [2019]). During the plea proceeding, the court stated, "In addition, as part of a plea bargain, you have agreed to sign the waiver of appeal; is that correct," to which defendant replied, "Yes." Beyond that, the court [*3]inquired only whether defendant was "prepared to execute the waiver now," and, after receiving an affirmative response from defense counsel, stated, "Go ahead." The court did not confirm that defendant understood the written waiver, that he had discussed the waiver with his counsel, or even that he had read it. Nor did the court ensure that defendant, who had never been a criminal defendant before, understood that the waiver of the right to appeal was separate and distinct from the trial rights that defendant automatically forfeited by pleading guilty (see e.g. People v Harris, 137 AD3d 514, 514 [1st Dept 2016], lv denied 27 NY3d 1070 [2016] [written waiver no substitute for on-the-record explanation of the nature of the right to appeal where the court never advised the defendant of the consequences of appeal waiver, or spoke to the defendant to ensure that he understood the rights he was forfeiting by signing the waiver]).
As to the merits of the suppression issue, the police may conduct a level three "forcible stop and detention" only when they possess the requisite "reasonable suspicion that a particular person has committed, is committing or is about to commit a felony or misdemeanor" (People v DeBour, 40 NY2d 210, 223 [1976], citing Terry v Ohio, 392 US 1 [1968]). Reasonable suspicion is the "quantum of knowledge sufficient to induce an ordinarily prudent and cautious [person] under the circumstances to believe criminal activity is at hand" (People v Cantor, 36 NY2d 106, 112-113 [1975]). The suspicion "may not rest on equivocal or innocuous behavior that is susceptible of an innocent as well as a culpable interpretation" (People v Hinshaw, 35 NY3d 427, 438 [2020] [internal quotation marks omitted]).
The officers did not have reasonable suspicion to conduct a level three forcible stop and detention by ordering defendant to put his hands against a wall, grabbing his arms, and forcing him to the ground. Defendant matched the description only in that he was a black male.[FN1] That a defendant matches a vague, general description, such as the one the complainant gave of the perpetrator, is insufficient to give rise to reasonable suspicion, particularly where, as here, key parts of the description do not match (see People v Bilal, 170 AD3d 83, 87-88 [1st Dept 2019], appeal dismissed 34 NY3d 1085 [2020]; People v Polhill, 102 AD3d 988 [2d Dept 2013], lv granted 21 NY3d 946 [2014], appeal dismissed 24 NY3d 995 [2014] [complainant's description of two black males wearing "dark clothing" did not furnish reasonable suspicion]; People v Jones, 174 AD3d 1532 [4th Dept 2019], lv denied 34 NY3d 982 [2019] [generic description of black male insufficient]; People v Miller, 191 AD3d 111 [4th Dept 2020] [no reasonable suspicion where "court failed to give adequate consideration to the difference between the location where the dispatcher stated that the suspect[] had been observed running from the crime scene . . . and the location where the officer stopped defendant[*4]"] [citation omitted] ). This is true even when the suspect is the only black male in the vicinity (see People v Ross, 251 AD2d 1020, 1021 [4th Dept 1998], appeal denied 251 AD2d 1020 [1998]), which was not demonstrated to be the case here.
Moreover, the radio run did not describe the suspect's clothing. But even if we credit the testimony of the officers that they relied on a dispatch description of a suspect wearing "dark clothing," such a description is still too general to justify a forcible stop (see People v Thomas, 300 AD2d 416 [2d Dept 2002], lv denied 99 NY2d 620 [2003] [generic description of black male wearing black clothing insufficient]; People v Riddick, 269 AD2d 471 [2d Dept 2000] [black male wearing black jacket insufficient]). Moreover, defendant had distinctive features that were not part of the description, including a goatee and tattoos, and he was wearing a backpack.
Although defendant was walking at a fast pace and hiding his face from the officers, such equivocal behavior was just as susceptible to an innocent interpretation and may not increase the level of suspicion so as to justify a forcible stop (see e.g. People v Powell, 246 AD2d 366, 369 [1st Dept 1998], appeal dismissed 92 NY2d 886 [1998] [the defendant's "quick pace" did not serve to increase a level-one or level-two intrusion to a level-three stop]). Walking at a quick pace is not considered flight (see People v Major, 115 AD3d 1, 6 [1st Dept 2014]). Defendant was under no obligation to walk more slowly or to show his face to the officers since he had a right to be let alone and refuse to respond to police inquiry (see People v Johnson, 109 AD3d 449, 450 [1st Dept 2013], appeal dismissed 23 NY3d 1001 [2014]). Defendant's desire not to make eye contact with the officers was equally consistent with an innocent desire as a black male to avoid interactions with the police.
The police admitted that they did not see the outline of a gun until after they wrestled defendant to the ground and thus could not use the presence of a weapon as a predicate for escalating the encounter from a level one to a level three.
Defense counsel preserved the issue in his suppression motion and post-hearing argument; and we would in any event reach any unpreserved arguments in the interest of justice. Accordingly, all of the evidence seized after the forcible stop, including the gun and items from defendant's backpack and statements made following his arrest, must be suppressed as the fruits of the officers' unlawful conduct (see People v Cantor, 36 NY2d at 114). Without that evidence, there was insufficient evidence to prove defendant's guilt on the attempted robbery and weapons possession charges.
Accordingly, the judgment of the Supreme Court, New York County (Bruce Allen, J. at hearing and plea; Maxwell Wiley, J. at sentencing), rendered March 3, 2016, convicting defendant, upon his guilty plea, of attempted robbery in the first degree, and sentencing him to a term of 3½ [*5]years, should be reversed, on the law, the motion granted, and the indictment dismissed.
All concur except Friedman, J., who dissents in an Opinion.

FRIEDMAN, J. (dissenting)
 

I would affirm defendant's conviction, upon his plea of guilty, to the crime of attempted robbery in the first degree. In my view, Supreme Court properly denied defendant's motion to suppress the evidence found upon his person when the police forcibly stopped and detained him. Given the absence of any grounds for disturbing the court's credibility determinations, the record fully supports the court's finding that the forcible stop was supported by reasonable suspicion that defendant had committed the attempted gunpoint robbery that was reported to have occurred nearby shortly before (see People v Martinez, 80 NY2d 444, 448 [1992]). Although defendant's appearance only partially matched a radioed description, reasonable suspicion was based on the "totality of the circumstances available to the police" (People v Johnson, 111 AD3d 469, 469 [1st Dept 2013], lv denied 22 NY3d 1157 [2014]), including defendant's presence on a nearly deserted street, late at night and in close spatial and temporal proximity to the reported crime. Most significantly, defendant engaged in behavior that the hearing court reasonably found to be highly unusual and indicative of a consciousness of guilt.
The motion court succinctly expressed the basis for its conclusion that the police, when they forcibly stopped and detained defendant, reasonably suspected that he was the man reported to have attempted to rob a woman at gunpoint:
"The officers had a report of an apparent attempted gunpoint robbery from a known civilian complainant. The description given by the complainant [of a black man in dark clothing wearing a baseball cap] was not detailed and did not fully match the defendant at the time Officers Delgado and Metaxas observed him. In particular, he had a gray shirt and no hat. But as the officers testified, a suspect could easily remove his outer top and hat. There were few people out at the time. The defendant was observed at a place one might expect the suspect to be found — walking rapidly from the scene of the reported incident towards the nearest subway station. After observing the patrol car, the defendant continued to walk quickly straight ahead while keeping his face turned toward the windows of the closed stores. This was highly unusual behavior, and evinced a consciousness of guilt that went beyond mere nervousness or a desire to be left alone. Given the totality of the circumstances, I find that the officers had reasonable suspicion that defendant was the reported perpetrator, and thus were entitled to forcibly stop, frisk, and detain him for a showup identification" (citations omitted).
To recapitulate, shortly before 2:00 a.m., Officers Luis Delgado and Valsamakis Metaxas, while riding in their patrol car, observed defendant crossing Third Avenue from east to west at East [*6]84th Street. This was in reasonably close physical and temporal proximity to the reported location (10 feet to the east of the corner of Third Avenue and East 81st Street) of an attempted gunpoint robbery that had been reported to the officers by radio transmission. On a night when the responding officers (as they testified at the suppression hearing) saw few people on the streets, defendant, who was wearing black pants and sneakers and carrying a black backpack, generally fit the description provided by the victim (cf. People v Bilal, 170 AD3d 83, 87-88 [1st Dept 2019], lv denied 34 NY3d 1085 [2020] [because incident took place in a densely populated area in the early evening hours, many people could have matched the vague description]). Upon reaching the west side of Third Avenue, defendant turned north, in the direction of the subway station at Lexington Avenue and East 86th Street; as the officers testified, perpetrators of street crime typically take the path to the nearest subway station after committing an offense. This path was not inconsistent with the broadcast that, immediately after the crime, the perpetrator fled westbound "towards Third Avenue."
Officers Delgado and Metaxas observed defendant, after he crossed Third Avenue, walking quickly up Third Avenue with his head turned to the side, toward the storefronts along the avenue. Both officers perceived, and the court found, that defendant was attempting to prevent the officers from seeing his face, evincing consciousness of guilt. Further, just before defendant was stopped near the entrance to the 86th Street subway station, he took two steps away from where the officers were standing, only to double back and continue walking toward the station (see People v Sierra, 83 NY2d 928, 929 [1994][a defendant's flight in response to approach by police, combined with other specific circumstances indicating that the defendant may be engaged in criminal activity, can give rise to reasonable suspicion]; People v Vieweg, 155 AD3d 1305, 1306-1308 [3d Dept 2017], lv denied 30 NY3d 1121 [2018][finding reasonable suspicion where the defendant only partially fit description and there was significant consciousness of guilt evidence]). There is no support in the record for defendant's theory that the officers stopped him simply because he was the first black man they saw in the vicinity of the attempted robbery.[FN2]
The majority does not offer a persuasive rationale for overturning the motion court's conclusion — based on well-supported findings of fact to which this Court owes deference — that the forcible stop and detention of defendant was supported by reasonable suspicion. While defendant's appearance did not entirely correspond to the reported description of the perpetrator, the majority incorrectly asserts that he "matched the description only in that he was a black male." In fact, the perpetrator was described as wearing dark or black clothing, and defendant was observed wearing black pants and black [*7]sneakers. While the perpetrator was described as wearing a baseball cap and (possibly) as wearing "all" dark clothing, defendant's appearance in a light gray shirt and without a hat could be attributed, as the officers testified, to his having removed his top and the hat, which was known to the officers to be a common behavior of fleeing offenders. The discrepancy between defendant's actual height (six feet, one inch) and the victim's description of the perpetrator's height (five feet, eight inches), as well as the omission from the victim's description of certain features of defendant (who was seen by the police to have a goatee and tattoos and to be wearing a backpack), are readily explained by the fact that the victim's description was based on viewing the perpetrator while he was threatening her with a gun — a stressful, fast-moving situation not conducive to careful observation.
In any event, the officers' reasonable suspicion was not based solely on defendant's appearance and his presence near the crime scene, but on those factors in combination with his odd behavior when the police were present but had neither approached him nor directed any inquiry to him. When the officers observed defendant, he was not merely walking quickly in the direction of the subway; he was walking with his head turned toward the storefronts lining Third Avenue, perpendicular to his direction of travel, apparently deliberately concealing his face from the police. Again, at that point, the police had not yet approached defendant or said anything to him, so the behavior was not reasonably attributable to a mere innocent desire to be left alone.
To reverse and grant suppression under the totality of the circumstances found by the motion court — the rough correspondence between defendant's appearance and the description of the perpetrator; the dearth of other pedestrians in the vicinity of the crime scene late at night; defendant's fast-paced walking toward the nearby subway; and, in particular, his strange behavior most readily attributable to consciousness of guilt — is to take the position that reasonable suspicion cannot be found in the absence of a detailed description that precisely fits the person stopped. Such an approach will render almost impossible the apprehension of the perpetrator of a crime unless the police themselves happen to have witnessed the offense. Accordingly, I respectfully dissent.
Judgment, Supreme Court, New York County (Bruce Allen, J. at hearing and plea; Maxwell Wiley, J. at sentencing), rendered March 3, 2016, reversed, on the law, the motion granted, and the indictment dismissed.
Opinion by Manzanet, J.P. All concur except Friedman, J. who dissents in an Opinion.
Manzanet, J.P., Mazzarelli, Friedman, Mendez, JJ.
THIS CONSTITUTES THE DECISION AND ORDER OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: June 7, 2022

Footnotes

Footnote 1: As noted, the complainant described the suspect as a five-foot eight-inch black male. She did not describe his clothing, and she omitted salient details about his appearance. According to radio dispatch, the perpetrator was a five-feet eight-inch black man wearing a baseball hat heading westbound on 81st Street. The officers admitted that defendant was much taller (indeed, over six feet), that he was not wearing a hat, that he was wearing a light gray T-shirt, and that he was walking north and not westward.

Footnote 2: Any conceivable inference that Officers Delgado and Metaxas stopped defendant based solely on his being a black male is negated by the fact that, when the officers saw him, they radioed the officers who were with the victim to obtain any possible clarification or amplification of the description of the perpetrator. This radio call was made while the officers were still in their patrol car following defendant, and before they had made any move to stop him.